Good afternoon, Your Honors, and may it please the Court, Stephanie Masplay for appellant slash cross-respondent Inge Anderson. This case arises out of the contentious marriage and divorce between Scott Anderson, a U.S. citizen, and Inge Anderson, an immigrant from the Netherlands. This case proceeded to trial on Inge's claims of breach of contract and intentional infliction of emotional distress. At the trial and on the appellant's motion for new trial thereafter, the trial court committed a number of errors, any of which provide a basis for reversal and a new trial. Ms. Masplay, if I could ask you a question about that. Are you asking for a new trial on all claims? Yes. Okay, even though you won one of those claims. That is correct. Okay. I would like to focus first on the issue of what constitutes income, as that term is used in the I-864 Affidavit of Support. The I-864 states that sponsoring party, that is, the signatory to the contract, must provide the intending immigrant any support necessary to maintain him or her at an income that is at least 125% of the federal poverty guidelines, 100% for active duty military. In a case for breach of contract under the I-864, courts have held that the amount the sponsor owes to the immigrant may be reduced by the amount of income that the immigrant receives elsewhere. The problem that the district court ran into, and the issue that this court must resolve, is that income is not defined either in the I-864 or under federal law. The district court here rejected the jury instructions proposed by both parties and instead used its own definition of income. That definition used by the district court is far too broad and resulted in a legally erroneous jury instruction. The purpose of the I-864 is to prevent admission of an immigrant likely to become a public charge. This court recognized in its opinion in Erler v. Erler and held that in order to effectuate that goal, the I-864 must be interpreted to make the sponsor, i.e. the signatory to the contract, more cautious about sponsoring immigrants. We've read your brief, so we understand the general framework. So to cut to the chase on this point, you've argued that this jury instruction led to an incorrect result on the attorney's fees, the tuition grant, and the health insurance. Do you think there were other effects of the error? Or if we agreed with you, could we just order those three things to be paid and you wouldn't need a new trial? Well, we are requesting a new trial on both claims. However, the way that Mr. Anderson testified, there could conceivably be other items that would not be income, depending on the definition of income that this court ultimately adopts. But I'm just trying to understand, like, do you think those three things are the only errors on what was considered income? Or do you think there were other errors? I think those are the three major things, Your Honor. There were a few other things that were included, such as, you know, he took her out to dinner a few times. He made some deductions for that. It wasn't entirely clear everything that was included in that, but there was a number of things, additional benefits, gifts of physical items that wouldn't be considered income that were also included in the deductions. I listed those three particular things because those are the biggest ones, both in terms of dollar amount and in terms of what was testified to as being important, that were deducted. So if we agreed with you on some or all of those three, would you really need a new trial? Or could the district court just adjust the amount owed? The district court could adjust the amount owed, yes. Was the tuition grant means tested? Did it depend on her income, whether she would get that grant? No, the tuition was provided through a service designed for people who had disabilities. So it was not means tested. It was dependent on her level of disability. And did the grant go straight to the school, or did it go to the county? How was it paid? Do you know? I don't know offhand. I believe that may be in the record, but I would have to double check for sure. I believe it was paid directly to the school, but I cannot answer that for sure. On the issue of the spreadsheet, could you explain, I don't know if you were counseled, I guess she was representing herself, so you probably weren't counseled, but do you understand what happened with the spreadsheet? Was it displayed to the jury? I don't know. It's not reflected in the record. As you pointed out, Ms. Anderson represented herself at trial. I was not involved at that point in time. I would also note that the spreadsheet is listed on the exhibit list, but there's no marking about it being admitted or even being an illustrative exhibit. There's just a blank box next to it. I believe that it was brought up during closing argument, but as for whether it was displayed to the jury during Mr. Anderson's testimony, I cannot answer that. Couldn't we therefore conclude, counsel, that it probably wasn't displayed to the jury if there's nothing in the record stating that it was? I think you can conclude that, but I don't think it matters for purposes of analyzing that issue. Tell us why. The issue and what was objected to at trial wasn't necessarily the exhibit. It was the testimony about what Mr. Anderson did to prepare this summary. I don't understand why the summary is the problem at that point. It seems like you could cross examine him about, do you really remember how much this cost or how much that cost, or do you really have records to support what you're testifying to today? All of that is separate and apart from some document he was using to refresh his recollection or whatever it was used for if it wasn't shown to the jury. The issue is that the summary that he was testifying to wasn't just numbers that he was remembering. He was utilizing documents such as bank records. He was utilizing something from the city of Washington, D.C. He was utilizing documents that reflected the cost of health insurance. That's where we run into the issue because he wouldn't know those things off the top of his head. He had to rely on documents for them. However, he cannot testify to the contents of those documents because that is hearsay. Case law is clear that if any one element of a summary is inadmissible, then the whole thing is inadmissible. But it wasn't admitted, it sounds like. His testimony was admitted. The evidence rule 1006 applies both to oral testimony and exhibits. So why not just hearsay objection? If he was saying the average rent in Washington, according to some website, was X, why not say that's hearsay and object based on that? Ms. Anderson objected at the onset of this testimony to his summary of everything that was to follow. She said it was authenticity, which is one basis as well to exclude some of the things that he testified to. The trial court, however, rejected that, believed that she was objecting based on something else. I'm not entirely sure, and said you can argue that. However, it did not engage in the necessary analysis to show whether it was actually admissible or not. I don't think she was required. Did she make objections on specific testimonial answers that what he said was not admissible? She did not, Your Honor, and I don't think she needed to. If she had needed to, she would have been objecting every other sentence. And the court, the law doesn't require you to object over and over and over and over and over again, as long as you get your point across. And I think when they started going into this testimony, she spoke up right away and said, this isn't admissible. I object, Your Honor. And that was sufficient to cover all of the testimony that followed regarding this particular. She said, this isn't admissible. Is that an objection to the particular chart? Or is that an objection, like a standing objection to everything the witness thereafter testified to? Yes, Your Honor. And she didn't state it was a standing objection, but Inga was pro se, and you need to construe objections of pro se litigants broadly. So her objection when she spoke up said, Your Honor, none of this is authenticated, meaning none of the things that are listed in this summary that he's prepared are admissible. But that's a very different thing than what you're saying today. I mean, the chart was not admitted as far as we can tell. It wasn't even shown to the jury. So if we assume that, then I don't know that it would even make sense to say his testimony wasn't authenticated. So I mean, it seems like you're really saying his testimony was based on hearsay, but it doesn't seem like she made that objection, if I'm understanding correctly. I believe she did make that objection, but that she did not articulate it well. Again, because Inga was pro se, you needed to construe her objections broadly. And I believe her objection, although she used the word authenticated, was in general an objection based on the admissibility of all of the things that he would be testifying to that were in this chart. Counsel, I thought that there was general law in most jurisdictions that unobjected to hearsay is admissible. Yes, Your Honor. However, because Inga was pro se, we need to take her objections broadly. So under ER, I forget the rule, I apologize. But under the rules regarding authenticity and authenticating documents, but was in general, objecting to the admissibility of the items that he would be testifying to. And given that we must take her objections broadly, because she was pro se, that the court shouldn't construe these as merely an objection based on So your client testified that she had been receiving food stamps. Were the food stamps counted as income? I don't believe there was any testimony or any evidence presented from either side about the dollar amount of the food stamps. So no, it was not deducted because there was never any evidence presented about how much those were worth. If there had been a dollar amount, do you think they should have been deducted? I would argue that no, they should not have been deducted. The reason I argue that is because that under I-864, this contract is designed not to protect the immigrant, but to protect the resources of the government. If the sponsor properly fulfills his duties under the contract, the immigrant shouldn't be using things like food stamps. She should be able to provide for herself. Hence, allowing deductions for things like food stamps and Section 8 housing benefits and things of the like runs contrary to the purpose of the I-864, which is to protect the resources of the government and to dissuade the sponsor from signing these without being prepared to accept the financial consequences. So that would be a different approach than the district court in Ehrler? That is correct. Speaking of Ehrler, Ms. Mesplay, the most recent Ninth Circuit Ehrler opinion issued in March of this year seems to reject your suggested definition of income as it pertains to sponsored spouses. Wouldn't you agree? I would agree, Your Honor. However, I would note that that opinion was unpublished and therefore has no precedential value, and this panel may decide in a way that is different than the panel in the second Ehrler decision. I would like to reserve the remainder of my time if I could. That is fine. Your time is reserved. Proceed to Ms. Miller. Ms. Miller, we can't hear you. I think you're on mute. Say something. Still can't hear you. Let's see. Hold on a second. So is Richard? Yes, Judge, I'm here. It does appear in Zoom that Ms. Miller is unmuted, so it appears to be a hardware issue on her end. As with yesterday, I would recommend trying to use the phone. Ms. Miller, can you hear me? I can only just barely make out your voice, Ms. Miller, and I recommend that at the bottom left of your screen there is the mute button. If you click on the upward facing arrow next to the mute button, the third option from the bottom is switch to phone audio. I would recommend trying that at this time. Ms. Miller, why don't you try getting closer to your microphone and say something and see if we can hear that. Okay. We did test this yesterday. I can hear you now. Can you hear me now? I think you're just too far back. Okay. I was going to say we tested it yesterday and it worked just fine, but sometimes in this new Zoom world, things can be unpredictable. You can hear me okay? I think we're adapting to all this, so take your time. I think if you're able to keep your voice as close to that mic as possible, then all of us will be enthralled. Thank you so much, Mr. Senior Judge. May it please the Court, Jennifer Miller, on behalf of the appellee and cross-appellate Lieutenant Colonel Scott Anderson, I would like to reserve two minutes for rebuttal now that my clock has started. Thank you. This Court should affirm the trial court decisions that are appealed by the pro se litigant. Ms. Miller, why don't you go with the question? If you're the appellee, how do you reserve time for rebuttal? I don't. I'm sorry, Your Honor. I'm cross-appellant as well, so that would help. This Court should affirm the trial decisions that are appealed in this case. They were based in law and logic. There are two different standards of review on the various issues that are raised by Ms. Anderson. De novo is appropriate for the rulings on motion for new trial. Abusive discretion is what this Court should use for the standard of review. The Honorable Judge Lasnik did a wonderful job of following the law, making a clear record, and making fair rulings with regard to the definition of income and set off, with regard to how he dealt with jury instructions, with regard to allowing the rebuttal witness, allowing the witness to refer to an illustrative exhibit that he had created to help his memory, and denying a motion for new trial. Your Honors should find that everything that Judge Lasnik did was appropriate in this case. I would like to address the questions that all three of your Honors brought up with regard to the summary chart. It is correct that Lieutenant Colonel Scott Anderson brought a motion to permit an illustrative exhibit that he could refer to, I would cite the Court's E.R. 48889. The Court considered his motion and any objection that was brought by Ms. Anderson. No objection was ever submitted in writing or offered during trial. And I would refer you to E.R. 507, Minute Entry 313 for that. The Court may admit illustrative exhibits at its discretion. If a summary chart is merely used for teaching or illustrative purposes, it does not qualify under Federal Rule of Evidence 1006, but still may be admissible within the Court's discretion under Federal Rule of Evidence 611A. 611A says the Court is authorized to exercise reasonable controls over the mode of presenting evidence so as to make presentation effective for ascertainment of the truth and to avoid the needless consumption of time. So can I just ask you, sorry, was this, you're calling it an illustrative chart shown to the jury? Your Honor, I don't believe that it was. United States v. Baker 10 F. 1347, Ninth Circuit case from 1993, indicates that it would be allowable for him to refer to this exhibit. And if it was information that he came up with himself, that these charts could actually be useful with large amounts of financial information and documents were at issue, I'd cite to United States v. Gardner 611 F. 2nd. 770, also a Ninth Circuit case from 1980. The District Court in Judge Lasnik was well within his discretion under Federal Rule of Evidence 611A to allow the witness to use this chart as an aid to remember what amounts were paid. We had a large amount of financial information that Lieutenant Scott Colonel Anderson was attempting to remember. A lot of various numbers he was attempting to recall. This was not admitted into evidence and thus is not subject to Federal Rule of Evidence 1006. And I would refer you to ER 331 and 507 minute entries there. Sorry, go ahead. Sorry, I wasn't sure if there was another question. I would like to address income. And I think income is important for two reasons in this case. The court address set off and your honors asked questions about the set of ERLR cases. It would appear that counsel improperly cited one of the ERLR cases. And I think it's important to note that ERLR stands for the proposition that the sponsor shouldn't pay more than what they expected when they signed the IA-64 affidavit. So that's the proposition that ERLR stands for. And the facts of ERLR were different than this case in that it was addressing another party in the household of the immigrant in this case. You would agree though, however, Ms. Miller, that the case law does suggest that we should avoid windfalls in favor of the sponsoring spouse, correct? Absolutely agree, your honor. Okay. And how does, how is TRICARE, the TRICARE benefit for which your client did not pay anything, not anything other than a windfall is in his favor? Well, your honor, TRICARE is a benefit that he, as a serviceman of our country, gets as part of his employment. So I would not claim it as a windfall. I would rather claim it as a benefit that he gets that she then also got and was a beneficiary of. Right. But if we count the calculation that he made as to the benefit to her from that, that does constitute a windfall in a sense because he wasn't paying anything for it, right? That is correct that he was not paying anything for it. However, the concern that I have even more so than what your honor points out, and I appreciate that, is the potential for double dipping. So to go back to what the court was asking about costs and what occurred if she received food stamps or other things, those agencies can go back to Mr. Johnson and he can owe monies back. So the windfall that we have, your honor, is actually the windfall for her in terms of benefits that she was able to get that then those agencies could come back to her. Is there any reason to think TRICARE would ask him to reimburse the health insurance amount that was paid for her? TRICARE is not so much specifically what the concern is that we had, your honor. The concern that we had is money for education or money for housing, SNAP allowances and benefits. Let's talk about the education for a second. It doesn't sound like it was means tested. So is there any reason to think that the education grant could be recovered from him? Your honor, at this point in time, we don't know. And the indicates there's some vagueness or some issues that need to be addressed. Is there any reason to even think it's possible it could be that the school or the grant giver would go after him for the education amount? There's never a reason to think that anybody will sue anybody until they do. Because it hasn't happened doesn't mean it won't. And I mean that not to be flip, but I think it's a legitimate concern at the time. If you disagree with your opposing counsel that it's not a means tested grant, it's not based on her level of income. Your honor, I'm going to be thoughtful in how I say this. There was a lot of information that was not offered by Miss Anderson. And there were a lot of things that we had to do to get that information, including to get the information about school, to get the information about the fact that she was employed when she filed this lawsuit with the U.S. Attorney General's Office, to get information about how much she was paid when working there. But for her misrepresentations to the court or lack of forthcoming approach with the court and with counsel, we would not have all this information. So part of the frustration is, in an ideal world, there would have been more information. But we were working in a small universe of what we were able to get. It was only through seeking requests for public information that we were able to confirm her employment with the USAG's office and then get information about what she was earning, the fact that she was working there in 2018, a year after the lawsuit. This doesn't sound like a response to the question about whether the educational grant was means tested. We don't know for sure that answer. I don't know that we had all the materials about the educational grant. We simply found out that she had gotten one. She submitted her own medical documentation. We didn't have complete access to all medical records. So she self-selected some medical records that showed or corroborated something with regard to disability, but we didn't have a complete access, if that makes sense. Could you explain why the attorney's fees amount should count as income from the divorce judgment? So that's a tough question, I think, a very thoughtful one. Because they took into account the I-864 when they resolved their case at the state level, and because it was a consideration, and because there was a benefit that she got in terms of a larger payout, and because she spent over 23 hours consulting with attorneys about exactly this thing, the I-864, ramifications, benefits, and everything else, and then she didn't fulfill her side of the bargain at the state level, and there was an outstanding judgment. My client wanted a credit for that against owed amounts. But she still owes him that money, right? She does. So how could it possibly be income? It wasn't so much income as a request for a credit, if you will. So it may have been in terms of the wording of it. She received money towards all of her attorney's other things, and spousal support equivalent, as part of... There's a pendente litem on the East Coast that pending a divorce, she got payments over a period of months. So the divorce... So those might count, I don't know, but that's not what I'm asking about. So I'm asking about the amount that the state court said she had to pay, which she still owes, but somehow, as I understand it, that amount was deducted from what Scott had to pay her as support, and I don't understand that. The attorney's fees were forgiven debt, which is always... But you just said it wasn't a forgiven debt. You said she still owes it. She never paid it. Right, but you just said it's not forgiven. She still owes it, so it is not a forgiven debt. So under what theory would it be income? She would no longer owe the debt now that it would be offset, which was the request that was made in court. So then why did you just say she still owes the money? Because it was offset in court, as I understand it. I apologize. I misunderstood Your Honor's question. What I mean to say, and I apologize for that, is that it was forgiven per court order, so I apologize. So under what court order was it forgiven? Can you point us to that? Your Honor, I will, as I'm continuing on my argument, look for that citation for you. I would like to briefly address the concerns that we did have with regard to not being allowed to deal with the issue of res judicata, and with regard to res judicata, Your Honors, the Nguyen case, I believe, is helpful and informative for Your Honors. State courts can deal with these issues on the state court level. And in fact, on many issues pertaining to family law, it is truly the state courts that deal with these things every day. And they're dealing with federal statutes. They're dealing with Child Relocation Act. They're dealing with tax issues, with Section 8 housing, federal entitlements, food stamps, Division of Military Benefits. So very often on the state level, they are naturally dealing with these issues of spousal support and resolution of a marriage. And in this case, Mr. Anderson, Lieutenant Colonel Scott Anderson, repeatedly brought up to the court and tried to bring up the fact that this had been dealt with at the state level, that there had been a bargaining for a higher resolution at the state level in terms of the amount of money that was given and the terms, and that one of the conditions of this was that he would be very cooperative with Ms. Anderson seeking her citizenship. All he was trying to do was help her on a path to citizenship. And so I think... She didn't get citizenship though, did she? She's purposely chosen not to so that she can continue to come back. And I think that's what sets this case apart from so many others because the concept of what is a public charge... You can't get out of this obligation for the 864 obligation because of a divorce or any contracting around it, right? I'm not understanding what you think the state court could have done that would eliminate the obligation that this case is about. Well, you can make a decision at the state court level that you're waiving and don't want to go to federal level and want to resolve. I think the irony... One case tells us that. Well, there are some cases that exist not in the ninth. And the facts are different in those cases, Your Honor. And so to that question, I understand your concern. I think what differentiates this case from any of other ones that have come before the court is that one of the ways that you can avoid or terminate I-864 responsibilities is when someone becomes subject to removal. And arguably, what has occurred here is exactly that. We have someone who came to the country, who's employable, who's been employed, who was employed when she filed this lawsuit, who chose to unemploy herself when she was making good money working for the Attorney General's office. She came back to keep this lawsuit alive. So she's not a public charge. The public policy concepts and thoughts behind the I-864 never mind our vagueness argument. And if there weren't issues with offset and there wasn't a vagueness issue, we wouldn't be here, right? And there are different things in different courts in terms of how do you define offset because it's not defined in the statute. So clearly, there's some issues there. But in this case, we have someone who is not a true public charge. I mean, the public policy reason behind I-864 was to make sure that it wasn't the citizens of the United States covering and paying for this person that got brought into our country that didn't have the ability to get employment. In this case- So how do we know that? I guess there was testimony that she was on food stamps. There was information presented to the court that she- That's my understanding. And we just discussed it with your opposing counsel. She said it wasn't deducted from the income. I think it's in the trial court, I understood it to be at ECF 192 at 212. But I don't think it's in our ER. And I guess what I was referring to is that she didn't disclose her mental disorders. That's the reason of why she could become subject to removal. And the issue of fraud is the issue that we tried to raise with the court in terms of why she could be removed. And so that was the concern that we had, Your Honor. Food stamps may have been deductible. The concern that we raised with the court was the issue of employment, non-disclosure of that, and the fact that that would potentially make her ineligible. So at the time that she filed the lawsuit, which was in 2007, and then she amended the complaint in August of 2018, she had started working and had been hired on April 4th, 2018, in the Consumer Protection Division of the Attorney General. And so the issue that we would have is whether or not because the lawsuit wasn't proper in the first place, and because she committed a fraud upon the court and upon the I-64, because she chose to underemploy herself for the purposes of keeping this lawsuit alive, she doesn't fit into the true than Lieutenant Skrull-Anderson. She had the ability to work, and in fact was working, making a base wage of almost $3,000 a month. So I think that's what differentiates this case from the others. In fact, that actually she's in a very different situation. I think set off the decisions that the court made were proper. Counsel didn't really touch upon the second charge, which the jury did not find enough information for the IED. I don't think, as Judge Atak you mentioned, that it would necessarily be necessary to have a trial on that issue. And so I agree with the fact that, as Your Honor, Judge Friedland said, that if we can deal with the issues of set off and definition following, what I would say we should do is follow with what the Ninth Circuit has already said in terms of precedent, in terms of set off. That does make sense. I still think, though, it's important to go back to there were issues that were raised by Lieutenant Skrull-Anderson, which she never got the chance to fully flesh out at trial court level. She had the chance to talk with counsel and knew what she was waiving at the state court level, potentially to get a better rate of return or payout. She always indicated she wanted to be a citizen. She, since 2014, has had the ability to try to be a citizen and is purposely choosing not to do so. But my understanding is that courts that have looked at defenses like unclean hands in the I-864 context have said that those defenses don't apply. Can you point us to any case that says that the kind of equitable arguments you're making do apply here? Your Honor, no, I can't. But here is the amazing thing. We are in unprecedented times where we are looking at immigration law, we are looking at fairness and equity, and your honors have the opportunity and ability to say to Congress, the way this law is written isn't fair and isn't proper. The facts of this particular case speak to exactly what we don't want. We don't want people coming in, preying off of our citizens, any more than we want them preying off of the country and the system that we have. This situation is a woman who is choosing to not be employed so that she can literally make Lieutenant Colonel Scott Anderson's life a living hell. He could be out over $850,000 and nowhere in that eight-page document, although it said, yes, you may have responsibility, did it ever spell out the dollar amount that he might be responsible for? At the point, she's employable. That's what's so striking about the facts of this case. It's a loophole. And your honors could help Congress realize if they put some... It doesn't point us to any case that says we shouldn't enforce a statute just because we think Congress was wrong to pass the statute. No, your honor. But I would say... We don't have a problem then with what you're asking us to do, don't we? It's an interesting quandary that you have because... I think just speaking as one judge, I think we probably have to enforce statutes the way they were written by Congress. Of course, any of us could write a concurring opinion saying Congress is way off base doing what it did and it should change this law, but that wouldn't affect the outcome here. Exactly. So let me ask, did you get to cover all your cross-appeal issues? Your honor, just the waiver and res judicata I mentioned briefly. So, yes, I did have the opportunity to touch on them. I would indicate that, you know, nowhere in the I-864 does it mention this dollar amount that you may be subject to. So in terms of... Well, counsel, how can it if it's based on what the federal poverty line is, which changes? It would be updated each year so that people are informed when they're entering into a contract. It's a third-party beneficiary contract. It would be more paperwork for the feds. I understand that. It's a lot to ask. At the same point in time, we asked them to screen people coming into our country to make sure they don't have mental health, pre-existing mental health issues that could cause danger for others in our country. They do that for all other immigrants that come in. So I think this is a reasonable ask in terms of what they could do or are capable of doing. So with that, thank you very much, Mr. Senior Judge. Thank you very much, Your Honors. Thank you. Thank you very much, Ms. Miller. So I think now we'll return to Ms. Mespley. And you reserved five minutes? That is correct. So please go ahead. To address the counterclaims asserted by the counterclaims on counter appeal asserted by Scott Anderson, first of all, none of these claims were made below. They were listed generally as defenses in his answer that was filed initially. However, when Inga Anderson went to file a motion for defenses or counterclaims, therefore, all of these issues are waived. However, even if the court reaches the issues, it should still affirm the trial court on these affirmative defenses and that these counterclaims were frivolous. Are you making that argument as a part of an effort to seek attorney's fees? Yes. So are you asking us to rule on that now, but a separate motion would follow or could you just explain how you understand the procedural posture of that? Yes, I believe that this court would rule on it now and under the Ninth Circuit local rules, a application for a fees would be submitted after the court issues its opinion. Is it possible that you could litigate that later if we didn't decide whether it was frivolous now? You could make a motion later saying that it had been frivolous? Yes, that would be possible. However, I think for the purposes of conserving judicial resources, that it would be most effective to adjudicate that issue along with the rest of the appeal. Now, as far as this claim goes that INGA is employable and has chosen not to seek employment, that issue is addressed head on in the Seventh Circuit opinion in lieu. The same issue was raised by the sponsor there that under the divorce decree that had been entered in state court, the immigrant was obligated to seek employment, otherwise she wouldn't be entitled to a spousal support. However, the Seventh Circuit said that there is no requirement that an employable immigrant seek to be employed. There's no duty to mitigate damages for an I-864 claim. The only defenses are offset and the four conditions that terminate the I-864 as listed in the statute. And because the obligation to seek employment is not something that is listed in that statute, that it cannot be added as an affirmative defense. Kathleen, I'm curious about your statement about no obligation to mitigate on damages because it's in an I-864. Would it be your position that your client, if she wanted to, could never work for the rest of her life and require her ex-spouse to support her throughout that period? That's precisely what the Seventh Circuit has said. We're not bound by the Seventh Circuit decision. That's why I'm asking you, is that your position? Yes, it is my position, unless of course one of the other conditions that terminate the I-864 comes into effect. Yes, there is no obligation for my client to seek employment while she remains in the United States. That is not a requirement under the statute, is not a requirement under the contract, and the contract only terminates when the statute says it does. Thank you, counsel. As far as the res judicata claim, I would note that that is answered by this court's decision in Ehrler. In Ehrler, the parties there had a premarital agreement about how much spousal support would be given. This court said that doesn't matter. The divorce has no effect on the I-864 because the I-864 is a contract between the sponsor and the U.S. government. And with that, Your Honor, I would rest my case and submit this case to the panel for consideration. Okay, thank you, counsel. Well, I think unless there are further questions from Judge Otake or Judge Friedland, I have none. I would just thank Ms. Mesplay, Ms. Miller, for your excellent advocacy. That's really a big help to us. These are difficult cases. In this case, the Anderson case shall now be submitted on the record, and the panel will issue a ruling in due course. Thank you. And that, I think, leads us to the conclusion of our hearing, Stacey, unless I've missed something here. We would adjourn. Is that correct? Pardon me? I think we're done for the week. Okay, the court is done. We can think about these cases a bit more and then start a weekend, and so can the advocates. So without further ado, the court shall submit this case and adjourn.
judges: Gould, Friedland, Otake